Tagged
Do not publish



**ORDERED in the Southern District of Florida on November 18, 2010.**

                      **Laurel M. Isicoff, Judge**
                      **United States Bankruptcy Court**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| In re: | Case No. 08-27710-BKC-LMI |
| YOUSSEF K. BOULOS, | Chapter 7 |
|     Debtor. | |
| _____/ | |
| ELIOT LUPKIN, | ADV. CASE NO. 09-1208-BKC-LMI |
|     Plaintiff, | |
| vs. | |
| YOUSSEF K. BOULOS, | |
|     Defendant. | |
| _____/ | |

**MEMORANDUM OPINION IN SUPPORT OF FINAL JUDGMENT**

    This matter came to be tried upon the Complaint (DE #1) filed by Plaintiff, Eliot Lupkin seeking a determination that the Debtor – Defendant, Youssef K. Boulos is not entitled to discharge pursuant to 11 U.S.C. §§727(a)(2)(A), 727(a)(3), 727(a)(4)(A), and 11 U.S.C. §727(a)(5), and that Mr. Boulos' obligations to Plaintiff are non-dischargeable pursuant to 11

U.S.C. §523(a)(2)(A).[1]  Because the Plaintiff has failed to meet his burden of proof on the relief sought, the Court has determined that judgment shall be entered in favor of the defendant, Mr. Boulos.

## JURISDICTION

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §1334(b) and 28 U.S.C. §157.  The jurisdiction of the bankruptcy courts is set forth in 28 U.S.C. §1334, which provides, in pertinent part, that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. §1334(b).  28 U.S.C. §157(b) provides that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title."  28 U.S.C. §157(b).  This matter is a core proceeding under 28 U.S.C. §157(b)(2)(I).  The following constitute the Court's findings of fact and conclusions in accordance with Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

This is a story of a good friendship that became toxic when two friends decided to go into business together.  Mr. Lupkin is an attorney, who has, for the most part, practiced law since 1986. (Tr. at 308)[2].  Mr. Boulos was, at all times relevant to this lawsuit, and until he went into business with Mr. Lupkin, a very successful high-end used car salesman.  When Mr. Boulos and Mr. Lupkin met, Mr. Boulos was working for a Chevy dealership, but ultimately Mr. Boulos started working at Autohaus Mercedes-Benz of Pompano.  (Tr. at 117-19).  Mr. Lupkin leased or purchased cars from Mr. Boulos and over time they developed a close friendship.  (TR. at 116-

---

[1] The trial took place over four days and was conducted on January 19 and 21, 2010 and April 19 and 20, 2010.
[2] All trial transcript references will be at (Tr. at __).

17, 309). Indeed, when Mr. Boulos' son was born, Mr. Lupkin came to the hospital. (Tr. at 116). Moreover, Mr. Lupkin represented Mr. Boulos' girlfriend, Rosalyn Gabriel, in her divorce. (Tr. at 309).

In early 2006, Autohaus was sold to AutoNation. Mr. Boulos left Autohaus and went to Autosport USA where, according to Mr. Boulos, he had a guaranteed income of $30,000 a month. (Tr. at 119). Meanwhile, in late 2005 or early 2006, (Tr. at 118-20), Mr. Boulos and Mr. Lupkin decided to go into the used car business together.[3] Apparently, Mr. Boulos did not have a used car dealer's license so Mr. Lupkin took the appropriate course and test and got the license. Other than Mr. Lupkin getting the dealer license, the understanding apparently was that Mr. Boulos would provide the know-how and Mr. Lupkin would provide the start up financing. (Tr. at 118-19, 126). Prior to the Buy It Wise fiasco there is no dispute that Mr. Boulos had an impeccable reputation in the industry. (Tr. at 186).

Mr. Boulos claims that Mr. Lupkin said he was putting together a group of investors who would bring in about $3.5 million in capital (Tr. at 126-28). Mr. Lupkin denies this (Tr. at 317) and claims he was only supposed to supply up front money for the lease. (Tr. at 324). In any event, in April 2006 Mr. Lupkin rented a facility. (Tr. at 323). Mr. Boulos subsequently left Autosport, and with the help of Mr. Lupkin's accountant, Mr. Segalaub, they formed a company called Buy it Wise, and off they went to buy cars to sell.

Apparently, many used cars are not bought off the street but are bought from car auctions and the car auction that Mr. Boulos had apparently regularly attended to buy high end used cars was the Manheim Auction. (Tr. at 186). Manheim Auction did provide floor plan financing to certain buyers so, in April 2006, Mr. Boulos and Mr. Lupkin applied for floor plan financing for

---

[3] There is a dispute regarding who came up with the idea.

Buy it Wise. (Tr. at 127-28). However, floor plan financing was not made available immediately. Indeed, Buy It Wise was not approved until mid-June.

On May 10, 2006, Mr. Boulos and Mr. Lupkin want to a Manheim car auction where Mr. Boulos bought ten cars for Buy it Wise. Mr. Lupkin claims he had no idea they were going to buy cars that day. (Tr. at 327-28). Mr. Boulos testified that Mr. Lupkin absolutely knew they were buying cars. (Tr. at 136). As a consequence of buying the ten cars, Mr. Boulos (he claims with Mr. Lupkin's knowledge and consent), wrote a post-dated check or checks totaling $477,000. (Tr. at 136). Mr. Lupkin claims he had not authorized any such payment, that as a lawyer he could not write checks if the money was not in the bank, and that he had to scramble, including having to liquidate his IRA, to get the money to cover the checks. (Tr. at 330-31). Mr. Lupkin also claims Mr. Boulos told him the ten cars would be switched to the Manheim floor plan financing once financing was approved and that everything would be fine. However, the parties dispute whether, when Manheim did allow some floor plan financing in June 2006, the cars were switched over. (Tr. at 137; *but see* Tr. at 333-34).

This incident was the beginning of a pattern of mutual financial distrust that permeated the partners' relationship until it ended in the Fall of 2006. Over the next few months the parties, depending on where in their respective testimony one looks, communicated regularly, (Tr. at 155, 325-30), had trouble communicating, (Tr. at 154-55, 346-47), refused to communicate, (Tr. at 191-92, 334), were afraid of each other, (Tr. at 211-12, 346), fought viciously, (Tr. at 152-54, 254, 332), and looted the Buy it Wise bank accounts. (Tr. at 151, 348-50).

All in all, while in business, Buy it Wise bought 135 cars from Manheim and the balance from individual sellers. (Tr. at 155-56). Of the 141 cars purchased, 85 were sold at a loss. All

4

85 that were sold at a loss were sold at the Manheim public car auction. (Tr. at 157). Most of the cars sold privately were sold at a profit. (Tr. at 616).

Ultimately, whether due to Mr. Boulos' alleged stealing or mismanagement, (Tr. at 348-50), or Mr. Lupkin's persistent, alleged unauthorized, withdrawals of funds from the company account (Tr. at 151), the obligations to Manheim went into default and all the remaining cars were repossessed by Manheim including the car being driven by Mr. Lupkin. (Tr. at 350-52).[4]

Manheim eventually got a judgment against Mr. Lupkin and Mr. Boulos on the deficiency after the repossessed cars were sold. Mr. Lupkin sued Mr. Boulos, Mr. Boulos' girlfriend Roslyn Gabriel, Manheim and others, accusing them of having created a kickback scheme to defraud Buy it Wise. (Tr. at 449-50). The case was stayed with respect to Mr. Boulos when he filed bankruptcy.

Mr. Boulos filed bankruptcy on November 20, 2008 (the "Petition Date"). When Mr. Boulos filed bankruptcy, Mr. Lupkin held an agreed judgment against Mr. Boulos in the amount of $500,000 (the "Consent Judgment").[5] Indeed, it was the sheriff's seizure of all of Mr. Boulos' and Ms. Gabriels' personal possessions from their condominium as part of a post-judgment collection that precipitated the bankruptcy filing. (Tr. at 72).

On February 23, 2009, Mr. Lupkin filed a five-count complaint against Mr. Boulos in the bankruptcy court. In Count I, Mr. Lupkin objects to the discharge of Mr. Boulos, pursuant to 11 U.S.C. §727(a)(2)(A). Mr. Lupkin alleges in the year prior to bankruptcy Mr. Boulos

---

[4] Much was made at trial regarding Ms. Gabriel's indirect purchase of the car Mr. Boulos was driving at the time of the Manheim repossession, but, while perhaps sneaky, Mr. Lupkin provided no evidence that the transaction was wrongful or that he was harmed. Indeed, the evidence showed that while the car may have been worth more (the only testimony as to value was by Mr. Lupkin's fraud expert who admitted he had never valued an automobile and had no expertise on car values) than the amount for which Ms. Gabriel purchased the car, Mr. Lupkin, as well as Mr. Boulos, benefitted from the purchase as it reduced their exposure on the Manheim guarantee.

[5] Because the Consent Judgment was agreed, and provided that "[a]ll claims against Youssef Boulos and Roslyn Gabriel in this case are dismissed," as well as claims brought by Mr. Boulos, there were no findings made by the state court judge and there is nothing in the record that indicates the nature of the lawsuit. (*See* Ex. 44).

"transferred, removed, destroyed, mutilated, or concealed" property including money and items of value for Mr. Boulos' former girlfriend, Roslyn Gabriel, and money for the benefit of unidentified third parties. (Compl. at ¶ 10). These items include a Rolex watch, diamond jewelry that Mr. Boulos allegedly owned jointly with Ms. Gabriel, a 2005 Harley Davidson motorcycle, a Mercedes Benz S55 automobile, and furniture.

In Count II, Mr. Lupkin objects to the discharge of Mr. Boulos under 11 U.S.C. §727(a)(3), alleging that Mr. Boulos failed to adequately maintain books and records including records regarding his disposition of personal property listed in a 2006 financial statement delivered to Manheim in connection with the application for floor plan financing, (the "April 2006 Financial Statement") (*Id.* at ¶ 12), Mr. Boulos' use of his income received in 2006, 2007, and 2008, his disposition of a $21,884.00 tax refund issued in May 2008, and his general failure to maintain books and records to account for the disposition of home furnishings and personal property within one year of the filing his bankruptcy petition. *Id.*

In Count III, Mr. Lupkin objects to Mr. Boulos' discharge pursuant to 11 U.S.C. §727(a)(4)(A) and alleges that Mr. Boulos knowingly and fraudulently failed to list a number of assets and interests in his bankruptcy schedules including, *inter alia*, Mr. Boulos' interests in several parking spaces at his Sunny Isles condominium, household goods and furnishings, jewelry, retirement accounts and other financial interests, interests in automobiles, and gifts and transfers to his former girlfriend, Roslyn Gabriel. (*Id.* at ¶14).

In Count IV, Mr. Lupkin alleges that Mr. Boulos has failed to adequately account for the loss of property and monies and therefore, pursuant to 11 U.S.C. §727(a)(5), is not entitled to a discharge. (*Id.* at ¶ 16). Mr. Lupkin alleges in support of this count that Mr. Boulos failed to disclose in his bankruptcy schedules and Statement of Financial Affairs certain non-real estate

6

assets valued in excess of $388,000.00, which were identified in the April 2006 Financial Statement.

In Count V, Mr. Lupkin seeks a determination under 11 U.S.C. §523(a)(2)(A), that Mr. Boulos' debt to Mr. Lupkin is not dischargeable alleging that Mr. Boulos obtained money from Mr. Lupkin based on false pretenses and actual fraud. Mr. Lupkin alleges that Mr. Boulos convinced him to enter into a business partnership, based on Mr. Boulos' representation that he had the business experience and connections to run a successful high-end used car dealership. Mr. Lupkin contends that he advanced Mr. Boulos money to fund initial start-up costs for the business based on Mr. Boulos' representations. Mr. Lupkin argues that he was "forced" to provide $477,000 in capital to cover a post-dated check issued by Mr. Boulos to acquire a number of high-end cars. Mr. Lupkin further alleges that instead of acquiring a number of high-end cars, a number of low-end cars appeared on the Buy it Wise lot (presumably purchased by Mr. Boulos).

## **STANDARDS FOR DISCHARGE**

A creditor seeking to deny a debtor's discharge bears the burden of proof as to each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991). The Court has carefully considered the record in this case and while the Court will not address all the evidence presented, the parties may be assured that the Court has considered all the evidence in rendering its decision.[6]

## **COUNT I**

11 U.S.C. §727(a)(2)(A) provides that a debtor shall not receive a discharge if

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this

---

[6] The Court, in reviewing the record, also noted pages, and in one instance, an entire deposition, that "accidentally" were included behind another exhibit. The Court did not consider these "rogue" documents in issuing this opinion.

7

>   title, has transferred, removed, destroyed, mutilated or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
>   (A) property of the debtor, within one year before the date of the filing of the petition; or
>   (B) property of the estate, after the date of the filing of the petition.

In order to prevail on Count I of the Complaint, Mr. Lupkin must show by a preponderance of the evidence that Mr. Boulos transferred or concealed property with the intent to hinder, delay, or defraud a creditor or the trustee and did so within one year prior to the petition date. *Marine Midland Bank, N.A. v. Mollon*, 160 B.R. 860, 864 (M.D. Fla. 1993). Denial of the discharge requires proof of actual fraudulent intent by the debtor. *Batcha v. Forness (In re Forness)*, 334 B.R. 724 (Bankr. M.D. Fla. 2005). Fraudulent intent can be imputed by looking at badges of fraud. *Dzikowski v. Chauncey (In re Chauncey)*, 308 B.R. 97, 105 (Bankr. S.D. Fla. 2004), *aff'd sub nom*, *Chauncey v. Dzikowski*, Case No. 04-80360-CIVPAINE, 2005 WL 2456223 (S.D. Fla. Mar. 31, 2005), *aff'd in part*, *rev'd in part,* 454 F.3d 1292 (11th Cir. 2006). Even a single badge of fraud may justify a finding of actual intent. *See Ingersoll v. Kriseman (In re Ingersoll)*, 124 B.R. 116, 122 (M.D. Fla. 1991).

The Plaintiff focuses primarily on the April 2006 Financial Statement, arguing that the Debtor represented in that financial statement that he had $388,000 in non-real estate assets. However, other than with respect to the Debtor's Rolex watch, which the Court will address separately, the Court finds the Debtor provided adequate explanation of the use and disposition of the various assets, and therefore the Court finds that even if any of these transfers did take place within one year prior to the Petition Date (which Mr. Lupkin did not prove), the Court finds those transfers were not done with the intent to hinder, delay or defraud a creditor.

The Rolex watch is somewhat more problematic. The Debtor claims he sold his Rolex watch, which he valued at $1,800.00 "hot" in a parking lot in Texas where he was living. He

8

cannot remember whether he sold it in July 2007, (Tr. at 197), December 2007, (Tr. at 198), or January 2008, (*Id.*), and he does not remember, or does not know, the name of the person to whom he sold it. The Debtor testified that he used the money he got for the watch for gas and food because he was not working at the time and needed money. (Tr. at 26). With respect to section 727(a)(2)(A), the burden is on Mr. Lupkin to prove Mr. Boulos transferred the watch within one year of the bankruptcy. Mr. Boulos' uncertainty regarding the date of the alleged sale does not satisfy Mr. Lupkin's burden and so the Court finds Mr. Lupkin has failed to meet his burden with respect to Count 1 of the Complaint and judgment will be entered in favor of Mr. Boulos on Count I.

## COUNT II

11 U.S.C. §727(a)(3) bars a debtor's discharge if

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case.

In order to prevail on Count II, Mr. Lupkin must show "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's transactions." *Sackett v. Shahid* (*In re Shahid*), 334 B.R. 698, 707 (Bankr. N.D. Fla. 2005) (quoting *Meridian Bank v. Alten* (*In re Alten*), 958 F.2d 1226, 1232 (3rd Cir. 1992)). As this Court stated in *Dunn v. Quiepo (In re Quiepo)*, 2007 WL 917248 (Bankr. S.D. Fla. Mar. 23, 2007):

> Integral to a finding that the Debtor failed to keep or preserve adequate records is a finding that the Debtor had a duty to keep or preserve the particular records of interest to the Trustee.

9

>       While it is true that debtors seeking discharge pursuant to chapter 7 of the Bankruptcy Code have a general duty to maintain comprehensible records, *Goldberg v. Lawrence (In re Lawrence)*, 227 B.R. 907 (Bankr. S.D. Fla. 1998), the nature and extent of that duty depends, for the most part, on the facts and circumstances of the particular case. *Krohn v. Frommann (In re Frommann),* 153 B.R. 113 (Bankr. E.D.N.Y. 1993). The court in *In re Frommann* recognized that '[i]f the debtor's transactions were such that others in like circumstances would ordinarily keep financial records, then she must show more than that she did not comprehend the need for them and must carry her explanation by way of justification to the point where it reasonably appears that because of unusual circumstances she was under no duty to keep them.' 153 B.R. at 117 (internal citations and punctuation marks omitted). The inverse is also true: if the debtor's transactions were such that others in like circumstances would not ordinarily keep financial records, then the debtor is not under a duty to keep them. Only after the Trustee satisfies her burden of showing that the Debtor's records are insufficient to determine the Debtor's financial condition and business transactions, does the burden shift to the Debtor to produce evidence to rebut the proof of insufficient records, or to justify the absence of records. *In re Young,* 346 B.R. at 608.
>
>       Whether a debtor's failure to retain records was justified must be determined in light of all the circumstances of the case. *In re Young,* 346 B.R. at 610 (citing *Christy v. Kowalski (In re Kowalski),* 316 B.R. 596, 603 (Bankr. E.D.N.Y. 2004); *see also Cox v. Lansdowne (In re Cox),* 904 F.2d 1399 (9th Cir. 1990)).

*Id.* at *3. The Court went on to note that

>       [a] 'combination of factors including the debtor's personal situation and circumstances beyond the debtor's control' may lead to justification of a failure to keep or preserve records. *In re Young,* 346 B.R. at 610 (citing *Ochs v. Nemes (In re Nemes),* 323 B.R. 316, 327 (Bankr. E.D.N.Y. 2005)).

*Id.* at *4.

The Complaint provides a long list of expenditures for which the Debtor allegedly failed to keep books and records. The Debtor produced, or Mr. Lupkin otherwise obtained[7], all of the Debtor's bank records and tax returns beginning in 2004 as well as the Debtor's credit card statements. (Tr. at 94). Indeed, the bank records and tax returns were part of the evidentiary record. The Court finds that those records were sufficient records for a consumer debtor to keep

---

[7] It is not clear whether Mr. Boulos produced the documents or Mr. Lupkin obtained the documents by subpoena from third parties.

and maintain with respect to his personal income and expenditures. Since Mr. Lupkin failed to demonstrate that the Debtor's records were "insufficient to determine the Debtor's financial condition and business transactions," the burden never shifted "to the Debtor to produce evidence to rebut the proof of insufficient records, or to justify the absence of records." Accordingly, with respect to Count II of the Complaint, judgment will be entered in favor of Mr. Boulos.

## COUNT III

Pursuant to 11 U.S.C. §727(a)(4), a debtor will not receive a discharge if

> (4) the debtor knowingly and fraudulently, in or in connection with the case –
>   (A) made a false oath or account;
>   (B) presented or used a false claim;
>   (C) gave, offered, received, or attempted to obtain money, property, or promise of money, property, or advantage, for acting or forbearing to act; or
>    (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

As this Court has previously noted in *In re Quiepo*, 2007 WL 917248,

> Some courts and commentators have held that fraudulent intent may be inferred from the totality of circumstances in the case, but analyze the omissions or nondisclosures to determine whether they were part of a scheme on the part of the debtor to retain assets for his own benefit at the expense of his creditors. *See In re Dupree*, 336 B.R. at 494. *See also In re Willis*, 243 B.R. 58 (9th Cir. B.A.P. 1999) (citing William L. Norton, Jr., NORTON BANKRUPTCY LAW AND PRACTICE 2D §74.11 (1997) and 6 Lawrence P. King et al., COLLIER ON BANKRUPTCY ¶ 727.04[1][B] (15th Ed. Rev. 1998)). However, the Eleventh Circuit has consistently held that '[d]eliberate omissions by the debtor may also result in the denial of a discharge.' *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616 (11th Cir. 1984) (citing *Raiford v. Abney (In re Matter of Raiford),* 695 F.2d 521, 522 (11th Cir. 1983). It makes no difference that the debtor does not intend to injure her creditors when she makes a false statement. *In re Chalik,* 748 F.2d at 618. To limit a finding of fraudulent intent to circumstances where the omission was made as a part of a scheme by the debtor to retain assets for her own benefit at the expense of her creditors, as suggested in *Dupree*, would ignore fraud upon

11

the court through deliberate false statements made in or in connection with a debtor's bankruptcy case.

In order to prevail on Count III, Mr. Lupkin must establish the following five elements: (1) the Debtor made a statement under oath; (2) that the statement was false; (3) the Debtor knew the statement was false; (4) the Debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *In re Shahid* at 709. For a false oath to be considered material, "it must be demonstrated that it 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" *Id.* (quoting *Chalik,* 748 F.2d at 618).

In this case the Plaintiff has alleged that the Debtor omitted a significant number of items from his schedules, as detailed in the Complaint. As *Chalik* reminds us, the fact that an asset has no value does not mean that its existence should not be disclosed. 748 F.2d at 618. It is not up to a debtor to decide what is material or not. The only assets that Mr. Boulos did not schedule were apparently, some personal property seized by the sheriff at Mr. Lupkin's behest and the tax refund. The seized personal property was certainly not concealed, and what property was not Ms. Gabriel's was turned over to the Trustee or the Trustee and Mr. Boulos made other arrangements satisfactory to the Trustee. The tax refund was also no secret and was also turned over to the Trustee. Accordingly the Court finds that Mr. Lupkin failed to prove the non-disclosure was fraudulent.

Mr. Lupkin also asserts Mr. Boulos failed to disclose his interest in three parking spaces, two cars and a Harley-Davidson as well as certain jewelry listed on the 2006 Financial Statement. The Court accepts the Debtor's explanation that the three parking spaces are part of the condominium – a standard provision. Mr. Lupkin failed to put on evidence that the spaces were not tied to ownership of the condominium. Mr. Lupkin also failed to provide evidence that

the car parked in those spaces belonged to Mr. Boulos rather than to Ms. Gabriel's father as Mr. Boulos testified.  The Court also accepts the Debtor's explanation that he did not schedule the Harley Davidson or the Mercedes S55 in his name because those were titled in Ms. Gabriel's name even though Mr. Boulos did have primary use of the S55.  Mr. Lupkin failed to demonstrate evidence to the contrary.  If Mr. Lupkin believes Mr. Boulos' payment of some expenses on the S55 created some claim by the bankruptcy estate the resolution did not lie in scheduling the car as the Debtor's asset.  That would have been inaccurate.  The Court has already addressed in Count I the balance of the allegedly unscheduled assets.

The Debtor did fail to disclose on his schedules his sale of his Texas apartment furniture, television and computer.  However, at no time did Mr. Lupkin provide any evidence of the value of these furnishings so there is no basis upon which this Court can find the omission was material.

Accordingly, judgment on Count III will be entered in favor of the Defendant.

## COUNT IV

A debtor will be denied his discharge under 11 U.S.C. §727(a)(5) if "the debtor has failed to explain satisfactorily, . . . any loss of assets or deficiency of assets to meet the debtor's liabilities."  To prevail on Count IV, Mr. Lupkin has the initial burden of demonstrating that the Debtor has lost assets.  *In re Shahid* at 710; *Luke v. Clegg* (*In re Clegg*, 352 B.R. 912 (Bankr. M.D. Fl. 2006)).  The burden then shifts to the debtor to provide a satisfactory explanation of the loss.  *Id.*  "To be satisfactory, 'an explanation' must convince the judge … [v]ague and indefinite explanations of losses that are based upon estimates incorporated by documentation are unsatisfactory."  *Chalik*, 748 F.2d at 619.

13

As to this count, the Court finds Mr. Lupkin has successfully demonstrated the Debtor no longer has his Rolex watch or the Texas furniture, television and computer. Indeed, Mr. Boulos conceded he sold them. Therefore, the burden then shifted to Mr. Boulos to satisfactorily explain the loss of his assets. *Id.* As noted already, Mr. Boulos claims to have sold his Rolex "hot" to someone in a parking lot for $1,200 because he needed money but he does not remember the name or number of the person to whom he sold the watch. (Tr. at 26, 28). Mr. Boulos also testified he sold his Texas furniture, television and computer[8] at a laundromat when he posted "for sale" signs because he needed the money for food and gas. (Tr. at 63). The Court has no dispute with Mr. Boulos' statement that he has been poor before and he has no shame in having had to take these measures to eat. (*Id.*). The Court also recognizes Mr. Boulos had a great deal of expenses, (Tr. 66-70), during this time period, was unemployed and, apparently, at this time, Ms. Gabriel was fighting cancer. (Tr. at 61). The Court finds truthful that Mr. Boulos no longer has the watch or furniture. The Court finds that Mr. Boulos did not need to get receipts for private sales of his watch or furniture. So while the explanations are barely satisfactory, they are satisfactory.

Accordingly, the Court finds that judgment on Count IV of the Complaint shall be entered in favor of Mr. Boulos.

## COUNT V

Mr. Lupkin also seeks a determination that at least Mr. Boulos' debt to him is non-dischargeable because the Debtor obtained "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition." 11 U.S.C. §523(a)(2)(A).

---

[8] Neither Mr. Lupkin nor Mr. Boulos described what this furniture was, or the value of the television or computer.

14

Mr. Lupkin must prove that: (1) the Debtor made a false representation to deceive Mr. Lupkin, (2) that Mr. Lupkin relied on the misrepresentation, (3) the reliance was justified, and (4) Mr. Lupkin sustained a loss as a result of the misrepresentation. *S.E.C. v. Bilzerian* (*In re Bilzerian*), 153 F.3d 1278, 1281 (11th Cir. 1998). Mr. Lupkin presented an overwhelming amount of testimony and documentary evidence purporting to show how Mr. Boulos led him into a business relationship, tricked him into having to put up almost $500,000 to cover checks, and then did not run the business the way it was supposed to be run.

Mr. Lupkin is not entitled to judgment in his favor on this count for two reasons. First, Mr. Lupkin is seeking to have the Consent Judgment held non-dischargeable. There is nothing in the record to suggest that the facts upon which Mr. Lupkin seeks the non-dischargeability finding relate to the Consent Judgment. Indeed, as previously noted, the Consent Judgment specifically provides that all claims against Mr. Boulos are released. Thus, there is no basis to find that the Consent Judgment is non-dischargeable. *Cf. Fuller v. Johannessen*, 76 F.3d 347 (11th Cir. 1996).

Second, Mr. Lupkin has completely failed to meet his burden to demonstrate that he has been aggrieved as he claims. The Court finds that these two individuals entered into a business relationship voluntarily. Whoever approached whom first, the Court finds that Mr. Lupkin and Mr. Boulos started out this business venture with the same goal in mind – to make money in a successful used car enterprise. Whether the business, and then personal, relationship went sour because of miscommunication, unfulfilled expectations or each one cheating the other, there is no question that these men ended up not trusting each other. However, there is no evidence whatsoever that Mr. Boulos initiated the business relationship, or that he did so with the intent to cheat Mr. Lupkin out of money.

Mr. Lupkin did demonstrate that Mr. Boulos deliberately tried to keep some information from him, (Tr. at 417; *see also* Ex. 48 at 41), but the record is not clear whether this was because Mr. Lupkin was taking money out of the company (Tr. at 151) or because Mr. Boulos wanted Mr. Lupkin out (Ex. 48 at 38-39). What is clear is that Mr. Lupkin (Tr. at 475), as well as both of Mr. Lupkin's financial witnesses, Mr. Segelaub the accountant, and Mr. Burrell, the certified fraud examiner, testified there was no evidence that Mr. Boulos took money out of the company or that he was involved in any kickback scheme with respect to the sale of the cars. (Tr. at 291-92, 610).

Indeed, Mr. Burell, Mr. Lupkin's proposed expert[9] testified that his conclusion that Mr. Boulos had stolen money was based on the fact that, after reviewing all the books and records of Buy it Wise and some of Mr. Boulos' personal records[10], he could find no other explanation why so many of the cars would have been sold at a loss. Having heard Mr. Burell's testimony, the Court finds that all of his testimony shall be excluded under F.R.E. 702 because first, Mr. Burell, even if he had been properly tendered as an expert witness, had absolutely no expertise in the used automobile business. Indeed, Mr. Burell testified this case was his first auto dealer case and he had no experience valuing automobiles. Mr. Burell's expertise as a certified fraud examiner in general did not qualify him as an expert to render the opinions he was asked to make. *See In re Citadel Broadcasting Corp.,* 2010 WL 2010808 (Bankr. S.D.N.Y. May 19, 2010); *In re WorldCom, Inc.,* 371 B.R. 33 (Bankr. S.D.N. Y. 2007). Moreover, Mr. Burell's so-called expert opinion - I could find no other explanation therefore he must have been stealing - is an example of the kind of unsubstantiated speculation that F.R.E. 702 is designed to exclude. In sum, Mr.

---

[9] Mr. Lupkin's attorney never actually asked that his witness be qualified as an expert. Nonetheless, with no objection from Mr. Boulos' attorney, Mr. Burell was asked to render his expert opinion.

[10] Notwithstanding that, according to Mr. Burrell, he reviewed thousands of pages of documents, and notwithstanding that counsel for Mr. Lupkin had all of Mr. Boulos' bank records, Mr. Burrell testified he only looked at a bit of Mr. Boulos' records.

Lupkin failed to prove that Mr. Boulos misrepresented their intended business relationship or that any loss sustained by Mr. Lupkin was the result of the alleged misrepresentation.

Accordingly, the Court finds the Plaintiff is not entitled to judgment in his favor on Count V of the Complaint.

### **CONCLUSION**

While many facts remain unclear or are in dispute, what is clear is that, like many divorces, only those who have loved so intently can hate so intently. Nothing in this opinion is intended to suggest that Mr. Boulos is an innocent; indeed neither Mr. Boulos nor Mr. Lupkin would meet that description. Frankly, the Court finds that both Mr. Boulos and Mr. Lupkin have, at best, faulty memories, and at worst, selective memories. Ultimately, this case revolves around who has the burden. The Plaintiff, having failed to meet his burden or the Debtor adequately defending where needed, the Court has no option but to enter judgment in favor of the Debtor. Debtor's counsel is instructed to prepare a final judgment consistent with this opinion.

###

Copies furnished to:
Jeffrey Berlowitz, Esq.
Keith Grumer, Esq.

*Attorney Berlowitz shall serve a conformed copy of this order upon all parties in interest and shall file a Certificate of Service of same with the Clerk of the Court.*